IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL D. HICKS,

      Petitioner,

v.                        Case No. 2:08-cv-01365

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

On November 25, 2008, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket sheet document # 1) and Memorandum of Law in support thereof (# 2). This matter is assigned to the Honorable David A. Faber, Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PROCEDURAL HISTORY

On or about December 12, 1994, Petitioner was indicted by a Kanawha County Grand Jury on one count of Murder. State v. Hicks, Case No. 04-F-405. (# 11, Ex. 1). Petitioner was initially convicted of the murder charge, following a jury trial, on or about May 26, 1995. However, his conviction was reversed by the Supreme Court of Appeals of West Virginia (the "SCAWV"), due to an issue concerning a remark from the gallery that was overheard by some of

the jurors, and Petitioner was retried under the same indictment. See State v. Hicks, 482 S.E.2d 641 (W. Va. 1996).

Following his second trial on October 27-28, 1998, Petitioner was convicted of First Degree Murder without a recommendation of mercy. (# 11, Ex. 2). By Order entered November 18, 1998, Petitioner was sentenced to life imprisonment without the possibility of parole. (Id., Ex. 3).

Petitioner filed a Petition for Appeal concerning his conviction in the SCAWV on April 9, 1999. The Petition for Appeal was refused by the SCAWV on October 6, 1999. (Id., Ex. 4).

On January 5, 2001, Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Kanawha County (Case No. 01-MISC-3). (Id., Ex. 5). An evidentiary hearing was held in that matter on March 11, 2004. By order entered May 10, 2004, the Circuit Court addressed the merits of Petitioner's claims and denied the petition. (Id., Ex. 6). The state habeas court made a specific finding that "[t]he results of the DNA testing presented as a part of this case did not call the jury's verdict into question." (Id., Conclusions of Law, ¶ 7).

On October 15, 2004, Petitioner filed a Petition for Appeal from the denial of his Circuit Court habeas corpus petition. On January 19, 2005, the SCAWV refused that petition. (Id., Ex. 7).

On June 16, 2006, the SCAWV issued its opinion in In the Matter of: Renewed Investigation of the State Police Crime

2

Laboratory, Serology Division, 633 S.E.2d 762 (W. Va. 2006) (popularly known as "Zain III").   In Zain III, the SCAWV specifically held:

> In order to guarantee that the serology evidence offered in each prisoner's prosecution will be subject to searching and painstaking scrutiny, this Court now holds that a prisoner who was convicted between 1979 and 1999 [footnote omitted] and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence and the challenge was finally adjudicated.

Id. at 770 (emphasis added).

The Zain III decision further stated that "a prisoner who challenges his or her conviction must prove that the serologist offered false evidence in his or her prosecution."   Also the prisoner must satisfy the following standards indicating that a new trial is warranted: (1) The evidence must appear to have been discovered since trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained; (2) It must appear from facts stated in his affidavit that the defendant was diligent in discovering the new evidence, and that it could not have been discovered with due diligence before the trial; (3) Such evidence must be new and material, and not merely cumulative; (4) The evidence must be such that it ought to produce an opposite result at a new trial on the merits; and (5) A new trial will generally be refused if the sole object of the new

evidence is to discredit or impeach an opposing witness.  Id. at 769 (citing State v. Frazier, 253 S.E.2d 534 (W. Va. 1979)).

Concerning the special procedures, the SCAWV further held that a prisoner against whom a serologist other than Fred Zain offered evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence, with counsel appointed to represent him or her.  The Court further held that the Circuit Courts must review the serology evidence "with searching and painstaking scrutiny" and must draft "a comprehensive order" which includes "detailed findings as to the truth or falsity of the serology evidence."  If the Circuit Court finds that the evidence was false, then the Circuit Court must determine whether the prisoner has shown the necessity of a new trial based on the five Frazier factors.  Id.

Petitioner filed a Zain III habeas petition on August 1, 2006. As noted above, Petitioner had already filed an unsuccessful habeas corpus petition in the Circuit Court of Kanawha County, in which the DNA testing was at issue.  On February 23, 2007, Lt. H.B. Myers of the West Virginia State Police Crime Laboratory, testified in Petitioner's Zain III habeas proceeding that new DNA testing on a piece of molding and a tennis shoe, which was conducted in 2003-2004 (during the course of Petitioner's first state habeas proceedings), had eliminated Petitioner as the depositor of blood on those items.  Petitioner claims that this new evidence indicates that he is actually innocent of the crime.

4

The state habeas court denied Petitioner's <u>Zain III</u> habeas petition, finding that Petitioner had not demonstrated that a new trial was warranted. The state habeas court made the following pertinent findings of fact:

> 3.  Lieutenant Howard Brent Myers (hereinafter "Lt. Myers"), a forensic scientist with West Virginia State Police Crime Laboratory, also testified during Petitioner's trial regarding the results of DNA testing on evidence found at the murder scene, including a tennis shoe and molding from a wall. Transcript of October 28, 1998 Trial, pg. 459-488 (hereinafter Tr. 1 459-488). Lt. Myers testified that according to the DNA testing, either Petitioner or one of the above-referenced witnesses [Terri Bannister] could have contributed to the blood stains on the tennis shoe and molding. Tr. II 29.
>
> * * *
>
> 7.  As a part of the [first] habeas petition, Lt. Myers was asked by the Public Defender's office to do more precise DNA testing, which had become more advanced. Tr. II 30. As a result of the advanced testing, Lt. Myers was able to exclude Petitioner as a possible source of the blood on the tennis shoe and molding. Tr. II 19, 29.
>
> 8.  By order entered May 10, 2004, this Court denied Petitioner's habeas petition. Regarding the advanced DNA testing results, this Court found that the jury's verdict was not called into question by the new DNA evidence presented to the Court by Lt. Myers.
>
> 9.  Petitioner filed a second habeas petition on August 1, 2006.
>
> 10. Petitioner was appointed counsel and thereafter filed an *Amended Petition of Writ of habeas Corpus* on November 1, 2006 [this petition was Petitioner's <u>Zain III</u> petition]. Said Petition seeks relief on the grounds that 1) false serology evidence was offered against Petitioner at his trial and that 2)

5

the West Virginia State Police Crime Laboratory intentionally failed to perform testing on certain evidence that could exculpate Petitioner.

11.   A hearing was held on February 23, 2007, during which Lt. Myers testified again regarding the results of the DNA testing on evidence offered during Petitioner's trial and habeas hearing. Lt. Myers stated that he had conducted DNA testing, not serology testing, on the evidence offered against Petitioner. Transcript of February 23, 2007 Hearing, pgs. 11, 28 (hereinafter "Tr. II 11, 28"). Further, Lt. Myers testified that certain evidence was not tested in this case because there was not a great likelihood of obtaining results from the evidence, based on the type of DNA testing used at that time, or because there was insufficient amounts of human DNA recovered to do testing. Tr. II 19-23, 31. This Court finds Lt. Myers testimony to be credible.

(# 1, Appx. C, at 25-27).

The state habeas court reasoned that, because DNA testing, and not the conventional "serology testing" that had previously been performed by the State Police Crime Laboratory, had been done in Petitioner's case, the Zain III decision was inapplicable to Petitioner's case. Specifically, the state habeas court made the following conclusions of law:

4.   Petitioner's argument that false serology evidence was used to prosecute him lacks a factual basis. Evidence in the record clearly indicates that serology evidence was not offered against Petitioner at his trial. Rather, the testimony of Lt. Myers established that DNA evidence was offered against the Petitioner. The scientific reliability of DNA evidence has been well established by the Supreme Court of Appeals of West Virginia for years and Petitioner does not allege that the DNA testing at issue was falsified in any way. See, e.g., Syl. Pt. 3, State v. Woodall, 182 W. Va. 15 (1989). As there is no evidence that this case falls within

6

the ambit of [<u>Zain III</u>], Petitioner's attempted reliance on that case is misplaced.

5.    Further, this court finds that there is no evidence that the West Virginia State Police Crime Laboratory intentionally failed to perform DNA testing on certain evidence that could exculpate Petitioner.   Rather, the evidence suggests that there were valid reasons why evidence was not tested.

6.    Finally, although Petitioner asserts that he should be granted a new trial based on the results of the more advanced DNA testing, this evidence was previously presented to this Court during Petitioner's prior habeas petition, and this Court previously found that the results of the advanced DNA testing did not call into question the jury's verdict.   Without any new evidence tending to call the jury's verdict into question, this Court has no reason to change its prior finding.

7.    Accordingly, this Court concludes that Petitioner has not presented any grounds for relief that provided a predicate for the issuance of a writ of habeas corpus or the granting of a new trial.

(<u>Id.</u> at 28-29).   The SCAWV refused Petitioner's appeal of the denial of his <u>Zain III</u> petition on September 4, 2008. (# 1 at 13, Appx. A).   Petitioner then filed the instant section 2254 petition on November 25, 2008.

In Ground One of his section 2254 petition, Petitioner claims that false evidence was offered at his trial, rendering his trial fundamentally unfair.   (# 1 at 7, Ground One).   In support of this claim, Petitioner's petition states:

At his October 28, 1998, trial for first degree murder a state witness Trooper Howard B. Myers told Petitioner's jury that petitioner could not be excluded as a contributor to blood found on a wall molding and a tennis shoe which was part of the state's evidence.   After his

7

trial, Trooper Howard B. Myers conducted additional test[ing] on the evidence, using more sophisticated equipment. Upon the results of the more sophisticated test, Lt. Myers eliminated Petitioner as a possible contributor of the blood found on the wall molding and tennis shoe. In addition, Lt. Myers concluded that the blood belonged to one of the state's key witnesses, Terri Bannister, who admitted she lowered [sic; lured?] the victim back to the trailer on the night of his murder, but denied any involvement in the actual murder.[1]

(Id. at 8, Supporting Facts of Ground One).  In Ground Two of his

section 2254 petition, Petitioner alleges:

The West Virginia State Police Crime Laboratory intentionally failed to perform DNA testing on certain evidence, specifically a Caucasian hair, a letter, and other evidence located in the state's evidence which could exculpate the Petitioner.

(Id. at 9, Ground Two).  In support of this claim, Petitioner's

petition further states:

At his October 28, 1998, trial there was certain evidence items which were not tested.  In this regard, the police located – (1) an envelope addressed to Glen Cain with a bloody fingerprint on it, (2) a Caucasian hair follicle, and other items with blood on them.  These items were found in and around the murder evidence, and were part of the state's evidence used before the jury.

On February 23, 2007, [see, Tr. Feb 23, 2007], Lt. Howard B. Myers explained away his failure to test these evidence items, by explaining that either no one asked

---

[1] As will be discussed in detail, infra, the State presented the testimony of two witnesses, Carli Campbell, a Caucasian female, and Terri Bannister, an African American female, who claim to have been present in a trailer (which belonged to Bannister's uncle, and in which Bannister and Petitioner had previously cohabited), when Petitioner killed the victim.  Both Campbell and Bannister denied any involvement in the murder itself, but Bannister admitted to helping move the victim's body and clean up the crime scene. Petitioner contends that either Campbell or Bannister, or both of them, could have committed the murder.

him to test some, or that he did not have the proper
equipment to test the items.

(Id. at 9, Supporting Facts of Ground Two).

On February 1, 2010, the presiding District Judge entered a
Memorandum Opinion and Order denying Respondent's previously filed
Motion to Dismiss Petition as Untimely Filed (# 29). On March 19,
2010, Respondent filed an Amended Answer (# 33), a Motion for
Summary Judgment, with attached exhibits (# 34), and a Memorandum
of Law in support thereof (# 35).

On February 23, 2010, pursuant to the holding in Roseboro v.
Garrison, 528 F.2d 309 (4th Cir. 1975), the undersigned entered an
Order advising Petitioner of his right and obligation to file a
response to the Motion for Summary Judgment, and setting deadlines
for a response and reply (# 36). On April 22, 2010, Petitioner
filed a Response to the Motion for Summary Judgment (# 40) and a
Memorandum of Law in support thereof (# 41). On May 21, 2010,
Respondent filed a Reply (# 43). This matter is ripe for
determination.

**STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d), which was adopted as part of the
Anti-terrorism and Effective Death Penalty Act of 1996 (the
"AEDPA") provides:

> An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.   The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.   Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and

10

convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. <u>See</u>, *e.g.*, <u>Blackledge v. Allison</u>, 431 U.S. 63, 81 (1977); <u>Maynard v. Dixon</u>, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## STATEMENT OF FACTS AND TRIAL TESTIMONY

At Petitioner's second trial, the State relied primarily on the testimony of two alleged eyewitnesses to the crime, Terri Bannister and Carli Campbell, both of whom pled guilty to lesser charges. Carli Campbell testified in person at both of Petitioner's trials; Ms. Bannister, however, could not be located to be served with a subpoena for the second trial. Thus, her testimony from the first trial, where she was cross-examined by Petitioner's counsel, was read into the record at the second trial. The following summary of the facts is derived from a review of the second trial transcript:

In September of 1994, a woman named Terri Bannister was living in a trailer that was owned by her uncle, Glen Cain, in the Amandaville area of St Albans in Kanawha County, West Virginia. At that time, Bannister had been in a romantic relationship with

11

Petitioner, Michael Hicks, for about one year. Petitioner lived with Bannister off and on at her uncle's trailer. (# 34, Ex. 16 at 374-376).

On the morning of September 9, 1994, Bannister left the trailer with the victim, Terrence Spencer, to make a drug deal. (Id. at 378). Bannister gave Spencer $30 for crack cocaine, but Spencer did not provide her with the drugs. Bannister was upset and headed back to the trailer with her cousin whom she had seen driving along the road. (Id. at 379).

When Bannister arrived back at the trailer, her friend Carli Campbell was there, waiting to buy some crack cocaine for herself. (Id. at 287). Bannister told Campbell and Petitioner that she had been "beat for some money" by Spencer. (Id. at 289; 379). The three of them then went out in Campbell's car to look for Spencer. (Id. at 290-292; 380). Not finding him, they returned to the trailer and dropped off Petitioner. Bannister and Campbell went back out to continue the search and eventually located Spencer. He agreed to return to the trailer with them. (Id. at 290-292; 380-381).

When Spencer arrived at the trailer, Bannister, Campbell and Spencer sat around the kitchen table while Spencer laid out some crack cocaine. (Id. at 294). Petitioner was in another room. (Id. at 383). According to both Bannister and Campbell, Petitioner emerged from behind Spencer and shot him in the back of the head with Bannister's .22 caliber handgun. (Id. at 384-385; 399).

12

Spencer fell to the floor, and Bannister became hysterical. (Id. at 296; 384-385). While Spencer was on the floor, Petitioner told Bannister to get a garbage bag from under the kitchen sink and Petitioner put the bag around Spencer's head, and then strangled him with a belt. (Id. at 296-297; 385-386). According to Bannister, the belt broke and Petitioner directed her to get another belt from the bedroom. (Id. at 387).

After the murder, Petitioner ordered Bannister to gather sheets and towels to clean up the blood. (Id. at 311). According to both Bannister and Campbell, Petitioner moved Spencer's body into Bannister's bedroom. (Id.) Campbell told Bannister she had to get to work and left the trailer. Around that time, Bannister's uncle, Glen Cain returned home for lunch. When Cain entered the trailer, he checked his mail and Bannister gave him $100 that she had removed from Spencer's body. Then Cain left about five or ten minutes later. (Id. at 389-391).

Bannister testified that she and Petitioner mopped up the blood with towels and sheets, and they placed the blood-soaked towels, sheets and some clothing items in garbage bags. Petitioner then removed the body from the trailer and hid it in the bushes outside. (Id. at 393-394). He then mowed the lawn while Bannister asked a neighbor if they could borrow her car in exchange for some crack cocaine. (Id. at 394-395). Petitioner and Bannister loaded the body and the garbage bags into the car. They put the garbage bags into a nearby dumpster and Petitioner dumped the body over a

bank of the Coal River.  (Id. at 396-398).

According to Bannister, on Sunday, September 11, she and Petitioner got a ride into Charleston to buy clothes for Petitioner since he had disposed of some of his clothing following the murder. (Id. at 403-404).  That same day, two fishermen discovered Spencer's body, which contained no identification and was missing a shoe.  (Id. at 244-250; 254, 256).

A volunteer fireman at the scene thought he recognized the murder victim as being a young man named Shawn Thompson.  (Id. at 256-257).  However, authorities went to Thompson's home and determined that he was alive.  Thompson informed the authorities that he had previously been mistaken for another young man from Detroit named Terrence Spencer, or "T-Bone."  (Id. at 257-258). The body was ultimately identified by Spencer's family as, in fact, being that of Spencer.  (Id. at 259-260).

One of the investigating officers, Detective Johnson, received a phone call from another deputy indicating that an anonymous source told him that evidence of the crime could be found in a dumpster in the Amandaville projects.  (Id. at 330).  Detective Johnson also received information from another anonymous source which implicated Petitioner and Bannister in the crime.  (Id. at 333).

Investigators found the garbage bags containing the bloody sheets and towels in the dumpster in Amandaville and found articles of clothing in and around the dumpster.  (Id. at 334).  The

14

victim's other shoe was located in the dumpster.  (Id. at 263).
While they were gathering evidence, the investigators heard
gunshots and received a report about gunshots coming from the area
around Glen Cain's trailer.  (Id. at 263-265).  According to Cain,
people had driven by and fired shots toward his trailer.  (Id. at
335).  The investigators learned that the shots may have been fired
by unidentified friends of the murder victim, Terrence Spencer.

     While the officers were questioning Cain, a vehicle driven by
a man identified as Donald "Porky" Martin, came up towards the
trailer.  Petitioner and Bannister were in the truck.  Upon seeing
the investigators, Porky turned the truck around and fled.  After
a short chase, the vehicle was stopped and the occupants were
apprehended and taken into custody for questioning.  (Id. at 267).

     During her interrogation, Bannister told police that
Petitioner killed Spencer and admitted her involvement.  She and
Petitioner were charged with murder.  Bannister did not tell police
that Carli Campbell had been present as well because she did not
want to get her in trouble.  (Id. at 404-406).  Bannister testified
that Campbell was an "innocent bystander" in the crime.  (Id. at
406).  The murder charge against Bannister was ultimately dropped
under the terms of a plea agreement in exchange for her testimony.

     Following the arrest of Petitioner and Bannister, police
obtained consent to search the trailer from Glen Cain.  During the
search, they recovered blood-stained evidence from several areas of
the trailer and several items of Petitioner's clothing.

15

Some of the items seized in the investigation were tested for DNA and fingerprints and some were not.  Detective Johnson testified that investigators are permitted only a certain number of DNA tests on evidence collected, and any items viewed as cumulative or of debatable worth were not tested.  (Id. at 364).

Lt. Howard Brent Myers of the West Virginia State Police Crime Laboratory testified about the testing that was performed on several items of evidence.  Lt. Myers testified that the blood found on the victim's tennis shoe that was found in the dumpster, as well as a piece of molding taken from a closet door in the trailer were "consistent with both [Petitioner] and Terri Bannister" and neither could be excluded as the source.  (Id. at 466).  Lt. Myers also testified that the DNA testing performed on the tennis shoe and molding was so imprecise that one in six African Americans could not be excluded as the source.  (Id. at 474).  Lt. Myers further testified that blood found on the belt that was recovered from the dumpster was consistent with that of the victim.  (Id. at 468).  Lt. Myers further testified that other items of evidence recovered at the crime scene matched the DNA of the victim, and other items were inconclusive.  Blood belonging to Glen Cain was also found at the scene.  Cain told investigators that he had cut his hand, and it was his blood on the envelope found at the trailer.  Therefore, the envelope was not tested. (Id. at 364).  An unidentified Caucasian hair that was subsequently found on the belt was not tested because, according to Lt. Myers,

16

it was of debatable relevance and unlikely to produce results. (Id. at 474).

The medical examiner's testimony concerning the cause of death was consistent with the testimony of Bannister and Campbell. He testified that the gunshot would have been fatal with or without the strangulation, but it could not be determined which occurred first. (Id. at 501).

Based upon a photograph, Carli Campbell identified a pair of jeans that had been recovered from the dumpster as resembling those Petitioner was wearing on the day of the murder. Trooper Myers testified that testing on the jeans revealed that blood was present, but no DNA testing was performed and the source of the blood was not identified.[2] A t-shirt identified by Carli Campbell as the shirt Petitioner was wearing on the day of the murder was not tested. (Id. at 479). No clothing items introduced into evidence were linked to Petitioner through serology or DNA evidence.

At the conclusion of the State's case-in-chief, the defense moved for a judgment of acquittal based on the fact that no evidence, other than accomplice testimony, was offered to show Petitioner's guilt. The motion was denied by the trial court.

---

[2] The trial record indicates that some of the clothing items that were collected as evidence may have been in the car that Petitioner and Bannister borrowed to dispose of the body and that blood got on those items while in the car. These jeans, which the defense attempted to show were women's jeans, may have been one such item.

17

(Id. at 505).

The defense did not call any witnesses and Petitioner did not testify.  The defendant's strategy was to attack the credibility of Bannister and Campbell's testimony tying Petitioner to the murder. The defense focused on inconsistencies in their testimony and questioned their motives.  In opening and closing arguments, the defense claimed that the State's case was full of holes, that Campbell and Bannister were unreliable and had their own motives to point the finger at Petitioner as the killer, and that the DNA testing was haphazard.

During Petitioner's habeas corpus proceedings, several items of evidence were submitted for re-testing using more advanced methods of DNA testing - particularly the tennis shoe and the molding. As a result of the re-testing, Petitioner was excluded as the source of the blood on both items.  At a hearing held on February 23, 2007, Lt. Myers testified that the more advanced testing revealed that Terri Bannister was the source of blood on both items.[3]  (# 1, Appx. D, at 11-12, 19).  It is on this basis that Petitioner seeks a writ of habeas corpus and a new trial.

## THE PARTIES' ARGUMENTS

Respondent's Motion for Summary Judgment and Memorandum of Law in support thereof first argue that the evidence concerning DNA

---

[3]   At trial, Ms. Bannister was asked if anyone other than Spencer had been injured or was bleeding at the time the crime was committed.  She said no.  (# 34, Ex. 16 at 399).

test results presented at Petitioner's trial was not false and that
Petitioner was not denied a fair trial.  The Memorandum of Law
states:

> The test results introduced at trial could not exclude
> Petitioner, and that is what was testified to at trial.
> Even if the evidence were indeed false or intentionally
> falsified, it was not sufficiently material to be
> prejudicial, nor sufficiently prejudicial to render his
> trial fundamentally unfair.  Evidence Petitioner claims
> was exculpatory and intentionally withheld was neither,
> but was actually immaterial.

(# 35 at 13).  Respondent claims that the State habeas court's
finding that the results of the more advanced DNA testing did not
call into question the jury's verdict is entitled to the
presumption of correctness, absent a showing that it was contrary
to applicable federal precedent.  Bell v. Jarvis, 236 F.3d 149, 158
(4th Cir. 2000).

Respondent's Memorandum of Law argues:

> The Supreme Court in Brady v. Maryland, 373 U.S. 83,
> 87 (1963), held that "the suppression by the prosecution
> of evidence favorable to an accused upon request violates
> due process where the evidence is material either to
> guilt or to punishment."  Brady has been interpreted by
> the courts to include not only the suppression of
> favorable evidence but the knowing use of false evidence
> by the prosecution.  "[D]eliberate deception of a court
> and jurors by the presentation of known false evidence is
> incompatible with rudimentary demands of justice."
> Giglio v. United States, 405 U.S. 150, 153
> (1972)(citation and internal quotation marks omitted);
> accord United States v. Agurs, 427 U.S. 97, 103
> (1976)("[T]he [Supreme] Court has consistently held that
> a conviction obtained by the knowing use of perjured
> testimony is fundamentally unfair, and must be set aside
> if there is any reasonable likelihood that the false
> testimony could have affected the judgment of the
> jury.")(internal citations omitted); "The same result
> obtains when the State, although not soliciting false

19

evidence, allows it to go uncorrected when it appears." <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959); <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935)(condemning "deliberate deception of court and jury by the presentation of testimony known to be perjured").

Under this category of <u>Brady</u> violations (as opposed to the intentional suppression of favorable evidence), referred to by the courts as a <u>Brady/Giglio</u> claim, the defendant is entitled to a new trial only if there is a "reasonable likelihood" the false evidence influenced the verdict towards guilt. <u>Agurs</u>, <u>supra</u>. But to first trigger an analysis under <u>Agurs</u> on a <u>Brady/Giglio</u> claim, Petitioner must show that: (1) the statement was *actually* false; (2) the statement was *material*; and (3) the prosecution *knew* it was *false*. [Footnote omitted]. <u>Cole v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998)(emphasis added). The statements must be "indisputably false" rather than "merely misleading." <u>Byrd v. Collins</u>, 209 F.3d 486, 517-18 (6th Cir. 2000)(citations omitted).

In this instance, Petitioner has failed to demonstrate that the evidence was false, that it was intentionally introduced with the knowledge it was false, that it was prejudicial, or that it was sufficiently material for the jury to have relied on it to the exclusion of other evidence of guilt.

(# 35 at 15-17).

The root of Petitioner's claim stems from the more sophisticated testing performed on the tennis shoe and the molding during Petitioner's habeas proceedings. Lt. Myers testified as follows about the re-testing:

[MYERS]:          In the original testing, we looked at one part of the DNA molecule. In that case, Ms. Bannister and [Petitioner] possessed the same type at that location. So, my testimony was that the blood on the tennis shoe, and I believe the molding, could have come from either one of those people, or anybody that would possess that type, which I believe the number was one in every six, using African American statistics.

20

```
THE COURT:        And as it turned out, by later testimony
                  [sic; testing] you excluded Mr. Hicks
                  from those two items?

[MYERS]:          That's correct.  It does not invalidate -
                  - there was no false testimony or
                  incorrect testimony originally.  Based on
                  the testing done at that time, my
                  conclusions were I could not eliminate
                  either of those individuals as depositing
                  that blood stain, which I stated.

                            *  *  *

                  But I just wanted to make absolutely
                  clear the original testing was performed
                  properly, the results and conclusions
                  were reported properly; its just that it
                  was not a very discriminating test.  And
                  now we have a much more discriminating
                  battery of tests that we can perform.
```

(# 34, Appx. D, at 29-30).  Respondent asserts that:

Without a showing that Myers purposefully falsified
the results and the prosecutor knew about it, this ground
fails to raise a claim under Brady/Giglio.  Inconclusive
results later clarified by more advanced testing do not
render evidence demonstrably false within the fact-based
threshold requirements of Brady/Giglio.  "The testimony
or statement elicited or made must have been a false one.
Accurate statements do not violate the Giglio rule."
Hammond v. Hall, 586 F.3d 1289, 1307 (11th Cir.
2009)(citations and quotations omitted).  This alone is
fatal to this claim, because without demonstrating that
the evidence was false and introduced with the knowledge
it was false, there is no due process violation under
Brady/Giglio which controls on this claim.

As such, the testimony of Lt. Myers cannot form the
basis for a claim that the findings of the habeas court
were an incorrect application of controlling federal
precedent.

(# 35 at 19).

21

Respondent further asserts that, even if the challenged evidence were shown to be false, and that the State knowingly and intentionally used it, it was not material or unduly prejudicial so as to render Petitioner's trial fundamentally unfair.  Respondent argues:

> In this case, the State's evidence of guilt rested almost entirely on the testimony of Bannister and Campbell.  Without them, the State would have no case under any analysis.  Therefore, under Brady/Giglio, this Court must find that the challenged evidence was sufficiently material to bolster (as presented at trial) or destroy (based on the results of subsequent testing) the credibility of the State's witnesses to the exclusion of all else, i.e. that the witnesses' credibility hinged entirely on the challenged evidence.
>
> The courts have long discouraged, even prohibited, reviewing courts from retrying evidence or reevaluating the credibility of witnesses from a cold record over a jury that was able to see and observe witnesses for themselves.  Marshall v. Lonberger, 459 U.S. 422, 434 (1983).  "Section 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor had been observed by the state trial court, but not by them."  To this end, the courts have consistently held that a jury is free to believe the uncorroborated testimony of a single witness and this will be sufficient evidence to sustain a conviction.  See, e.g., United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997).  See also Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir. 2002)(noting that attacks on witness credibility constitute a challenge to the quality, but not the sufficiency, of the government's evidence).
>
> * * *
>
> There are two ways to examine this evidence in the context of a trial that rested entirely on witness credibility: 1) That it was so persuasive that it bolstered the credibility of the witnesses to the exclusion of all else by tying Petitioner to the murder; or 2) that the later results of retesting excluding Petitioner would have rendered the witness testimony unreliable and create reasonable doubt in the minds of

the jurors -- in effect, removing Petitioner from the scene and ultimately proving him actually innocent.

This claim fails under either analysis. The evidence at trial was inconclusive. Because it was inconclusive, it could not positively identify Petitioner as the source. If Petitioner was not identified as the source, then the jury could not have relied on this evidence to put him at the scene of the murder. The most the jury could have done was infer that Petitioner could possibly be the source of the blood, which is probative of nothing and certainly not sufficiently material to form the foundation for the eyewitnesses' credibility.

There was no other evidence introduced at trial that could be viewed as bolstering the witnesses' credibility. No other eyewitnesses put Petitioner at the scene at the time of the murder. No other blood evidence tied him to the scene, and the challenged evidence was ambiguous at best and useless at worst. Likewise, putting Petitioner at the scene at the *time* of the murder and proving he *committed* the murder are two vastly different things. Evidence pit Cain, Bannister, Campbell, and Petitioner at the scene of the crime at the time of the murder, but because all but Campbell lived there and all but Petitioner admitted to being there at times during the crime, any such evidence was irrelevant -- for them and for the Petitioner.

The results of the newer DNA testing performed in 2004 neither exculpated the Petitioner nor inculpated Ms. Bannister. Therefore, they were not sufficient to undermine confidence in the outcome of Petitioner's trial.

(<u>Id.</u> at 20-22).

Petitioner's Response to Respondent's Motion for Summary

Judgment argues:

Officer Myers purposefully and intentionally failed to perform available DNA additional testing on the evidence which would have excluded Petitioner, contrary to Officer Myers' trial testimony that Petitioner could not be excluded. Petitioner therefore believes that Officer Myers' trial testimony was a misrepresentation of the facts surrounding the testing of the evidence in this case, in violation of the <u>Napue v. Illinois</u> and <u>Mooney v.</u>

23

> Collohan line of cases.  Petitioner also contends that
> Officer Myers purposely withheld additional DNA test
> results on the blood evidence which would have created
> doubt and contradicted the testimony of key state
> witnesses, thereby violating the principles embodied in
> Brady v. Maryland and the Zain line of cases.

(# 40 at 7).   Thus,  Petitioner  contends  that  Lt.  Myers

intentionally misrepresented the facts in order to bolster the

State's case.  (Id. at 8).

Petitioner  further  asserts  that  the  state  habeas  court

unreasonably determined that Petitioner was not entitled to full

review of his Zain III claim on the ground that Zain III did not

apply to Petitioner's case because it involved DNA testing, not

standard  serology  testing,  as  contemplated  by  the  SCAWV.

Petitioner further argues that he can meet the "cause and prejudice

test"  and  can  show  that  a  "complete  miscarriage  of  justice"

occurred at his trial in violation of his due process rights.  (Id.

at 9-10).   The Response further states:

> The DNA evidence excluding Petitioner from the blood
> evidence on the shoe was new to Petitioner and was not
> available at the 2004 (first) state habeas hearing.  The
> 2007 (second) state habeas court *completely overlooked*
> *this new exclusionary evidence* and summarily dismissed
> Petitioner's Zain III claim, holding that the state court
> had already addressed Petitioner's arguments about the
> materiality of the DNA evidence and its effect on
> Petitioner's jury trial in the 2004 (first) habeas
> hearing.  The state court's reasoning is fundamentally
> flawed, in that it refused to recognize the importance of
> the new exclusionary evidence developed since the first
> habeas hearing.  The resulting summary dismissal resulted
> in a complete miscarriage of justice and explains why the
> claim was not developed on the record and fully
> adjudicated at the state level.

(Id. at 10).

24

Petitioner's Response further contends:

> In the instant case, Officer Myers could have
> conducted collateral DNA tests to exclude Petitioner as
> a possible donor to the blood evidence prior to
> Petitioner's trial.  Instead, Officer Myers chose to
> ignore the ASCLD [American Society of Crime Laboratory
> Directors] guidelines and relied on weaker PCR DNA tests
> to mislead the trial jury that Petitioner could not be
> excluded as the donor.  It is clear that this testimony
> had the effect of inculpating Petitioner in the murder of
> Terrence Spencer and bolstering the otherwise
> contradictory testimony of the State's key witnesses, who
> were later inculpated in the murder. [FN 17]
>
> [FN 17 - When more advanced testing was done on the blood
> evidence (for the habeas hearings), it was identified as
> having come from Terri Bannister, one of the State
> witnesses.  Moreover, a Caucasian hair encased in blood
> was found on the murder weapon (a belt), and the other
> State witness, Carli Campbell, was the only Caucasian
> present at the murder.]

(Id. at 14).  Petitioner claims that, around that same time, Lt.
Myers elected to perform more advanced testing in other cases in
which inconclusive results were found and, therefore, he falsely
testified that Petitioner could not be excluded in his case.
Petitioner further asserts that ABO and chromosome testing could
have been done on the blood evidence to determine whether it came
from a male or female, and that such testing was not done.  (Id. at
14-15).

Petitioner's Response further asserts:

> The Petitioner does not argue that Officer Myers'
> conduct rises to a Napue violation because Myers failed
> to perform collateral testing.  Rather, Petitioner argues
> that it rises to a Napue violation because Officer Myers
> provided false sworn testimony that Petitioner could not
> be excluded as a contributor to the blood evidence, when
> in fact collateral testing would have done precisely
> that.

25

Likewise, Petitioner does not argue that Officer
Myers' conduct rises to a <u>Brady</u> violation because Myers
failed to perform collateral testing.  Rather Petitioner
argues that it rises to a <u>Brady</u> violation because once
Officer Myers had reason to believe there was evidence
that contradicted the State's case (Caucasian hair on
belt) or which tended to exculpate Petitioner and
inculpate State witnesses (blood evidence), he had a duty
under <u>Brady</u> to further develop the record and provide
findings to Petitioner as mandated by the Due Process
Clause of the United States Constitution.

As a result of these <u>Napue</u> and <u>Brady</u> violations,
Petitioner was convicted of a crime he did not commit, a
miscarriage of justice resulting from fundamentally
unfair proceedings.

(<u>Id.</u> at 15-16).

Petitioner's false evidence claim turns on his belief that the

fact that Bannister's blood was found on the victim's shoe and a

Caucasian hair (presumed to have come from the other eyewitness,

Carli Campbell) somehow exculpates him from having committed the

murder of Terrence Spencer.  Petitioner further argues the alleged

relevance of this "suppressed" evidence as follows:

Officer Myers testified during Petitioner's trial
that he collected a Caucasian hair, encased in blood,
from the murder weapon.  The State, however, did not seek
to obtain a blood sample from Carli Campbell (the only
Caucasian involved in the case), nor did Officer Myers
test the hair or make recommendations to a lab for
testing of the hair. * * *

Despite Officer Myers' testimony that he did not
know who donated the hair on the murder weapon and
despite the State's failure to obtain Carli Campbell's
blood for testing, Respondent now appears to concede that
Carli Campbell donated the hair.  Respondent asserts,
however, that had this been known prior to or during
trial, it would not have affected the outcome of the
trial.  Petitioner respectfully disagrees with this
assertion.  In her trial testimony, Campbell admitted
only that she helped lower [sic; lure] Spencer back to

26

the Cain trailer and that she did not participate in
Spencer's murder or the subsequent cleanup. Campbell
further testified that after the murder, she left the
trailer immediately. Neither Campbell nor Bannister
offered a reasonable explanation in trial testimony about
how Campbell's hair was encased in blood and deposited on
the murder weapon. In fact, viewing their testimony in
the light most favorable to the State (excluding many
contradictions), Bannister and Campbell claim that
Bannister retrieved the belt while Campbell idly
observed. In light of Campbell's testimony that she did
not participate in the cleanup or body disposal at all,
the record does not explain how Campbell's hair was
encased in blood and deposited on the murder weapon. Had
the hair evidence not been suppressed, it would have cast
reasonable doubt on Campbell's testimony. Since
Petitioner was convicted almost solely on the testimony
of Campbell and Bannister, this would have had a material
impact on the jury's verdict.

(Id. at 16-17). Petitioner further argues:

In this case the victim was found wearing only one
shoe. The other shoe, found in a dumpster behind the
Cain trailer, had blood on it that did not come from the
victim. The donor of this blood should have been the
obvious prime suspect in the murder. [FN 18 - Later, more
advanced testing determined that Bannister deposited the
blood on the shoe]. Campbell and Bannister, however,
talked to the police first and told a story implicating
Petitioner in the murder. No part of this story
explained how Campbell's hair was found encased in blood
on the murder weapon, or how Bannister's blood was
deposited on the victim's shoe. Moreover, Cain
(Bannister's uncle) testified that he went all the way to
the back of the trailer and never saw Petitioner at the
crime scene.

* * *

Thus, Petitioner was convicted on the basis of (1)
the questionable testimony of two state witnesses that
have been inculpated in the crime, and (2) the false and
misleading testimony from Officer Myers that Petitioner
could not be excluded as a donor to the blood evidence.
The newly discovered evidence raises serious doubts about
all of this evidence, and is clearly material. It
clearly impacted the jury's decision-making process.

27

(Id. at 17-18).

Petitioner's Response also focuses on an inadvertent misstatement that occurred in Trooper Myers' testimony.  During his direct examination, Trooper Myers testified that the blood on the belt recovered from the dumpster was that of the victim, Terrence Spencer, and was not consistent with the other three individuals (Petitioner, Bannister or Campbell).  (# 34, Ex. 16 at 467). However, shortly thereafter, the prosecutor misstated that the blood on the belt belonged to Petitioner, and Trooper Myers agreed. The testimony stated:

> Q.    And you said - - you mentioned a belt.  That was an item on which you found the defendant's blood, or DNA that was consistent?
>
> A.    DNA that was consistent; that's correct.

(Id. at 468).  Petitioner claims that "[t]his conduct of misleading questions and erroneous testimony continued with other witnesses who testified against Petitioner in his first trial.  It carried over to Petitioner's second trial."  (# 40 at 12).[4]

Trooper Myers corrected this misstatement on cross-examination and again on redirect examination.  (# 34, Ex. 16 at 470, 483).  In his Reply, Respondent asserts:

> Although Trooper Myers failed to correct the prosecutor's question misidentifying Petitioner as the source of the

---

[4]  Petitioner's brief suggests that this misstatement occurred in his first trial and "carried over" into his second trial (# 40 at 12).  A review of the record before this court indicates that assertion is incorrect.  This testimony appears in the transcript of the second trial.

blood on the belt, there is no evidence to suggest that this testimony was intentionally false within the meaning of <u>Brady/Giglio</u>.    Rather,   it   was   an   inadvertent misstatement   that   was   almost   immediately   corrected through   his   subsequent   testimony.      Moreover,   the incorrect statement itself came from the prosecutor, and was likely missed by Trooper Myers, whose response was focused on his findings that it was "consistent with" the previously identified individual.

        The challenged comment amounted to no more than an isolated remark prompted by an inartfully worded question from   the   prosecutor.      It   was   almost   certainly   also overlooked   by   the   jury,   given   its   fleeting   nature   in light of the previous and subsequent testimony correctly stating the scientific findings.    In all, these findings were stated correctly three times-once before and twice after   the   challenged   misstatement   was   made.      Therefore, it cannot be said that intentionally false evidence stood uncorrected to such an extent as to create a due process violation within the meaning of <u>Brady</u> and its progeny.

(# 43 at 3-4).

    Petitioner   also   filed   a   Memorandum   of   Law   in   Support   of   his Response   (# 41).    In   this   document,   Petitioner   attempts   to   argue that   his   jury   verdict   was   not   unanimous,   relying   upon   an   affidavit from   a   juror   in   his   trial,   which   states   that   the   juror   believed that   Terri   Bannister   killed   Terrence   Spencer.    (# 41, Appx. A). The   affidavit   further   states   that   Bannister's   prior   testimony having   been   read   to   the   jury,   rather   than   her   physical   presence   at the   trial,   affected   the   juror's   ability   to   evaluate   her credibility.    (<u>Id.</u>, ¶ 6).    The   affidavit,   which   appears   to   have been   submitted   in   Petitioner's   first   state   habeas   corpus proceeding, <u>State ex rel. Hicks v. Painter</u>, Case No. 01-MISC-3, does   not   mention   anything   about   the   DNA   evidence   or   test   results. The state habeas court did not rely on this affidavit in making its

findings of fact and conclusions of law, and Petitioner has not exhausted any claim related to this issue in his state habeas proceedings.   Nor did he raise any such claim in his section 2254 petition.   Thus, the undersigned will not further address it herein.

Petitioner's Memorandum of Law also attempts to argue that Lt. Myers had a history of similar "bad acts."   Petitioner submitted reports from the <u>Zain</u> line of cases showing improprieties with serology testing in a 1989 case in which Myers conducted testing. (<u>Id.</u>, Appx. B and C).   The undersigned finds this documentation to be irrelevant to the instant proceeding, in light of the state habeas court's finding that <u>Zain III</u> was inapplicable to Petitioner's case.   As will be further discussed below, this federal court is bound by the state court's determination of state law.

Respondent's Reply further emphasizes that the State had no constitutional duty to perform more advanced testing on the evidence (citing <u>Arizona v. Youngblood</u>, 488 U.S. 51, 59 (1988) and <u>District Atty's Office for the Third Judicial Cir. v. Osborne</u>, ___ U.S. ___, 129 S. Ct. 2308, 2320 (2009).   (<u>Id.</u> at 4).   Respondent's Reply further states:

> Neither does <u>Brady</u> create an obligation for the State to determine what evidence will or will not be material to a defense theory of the case.   Therefore, there can be no <u>Brady</u> violation if the State merely fails to perform the most advanced forensic testing available on every item of evidence, regardless of its potential relevance at trial.

(Id. at 5).

## ANALYSIS

First, Petitioner's claim that the state court's finding that Petitioner was not entitled to review under the "newly discovered evidence" standards set forth in Zain III is not an unreasonable application of clearly established federal law because the Zain III decision is a state court decision and, thus, a matter of state law.  Petitioner presented this claim in his habeas appeal following the denial of his Zain III habeas, and the appeal was refused.  Therefore, this federal court is bound by the state's highest court's decision that Petitioner's claim that Zain III claim did not warrant review.  See Wainwright v. Goode, 464 U.S. 78, 84 (1983); Garner v. Louisiana, 368 U.S. 157, 169 (1961)("the views of the state's highest court with respect to state law are binding on the federal courts."); Faircloth v. Finesod, 938 F.2d 513, 517 n.9 (4th Cir. 1991)("This court is bound by the state court's interpretation [of a state statute], and must assume that the statute says what the state court says it says.")

Turning to Petitioner's claims raised under Brady, Giglio and Napue, Petitioner's claims turn on whether the evidence of the blood on the shoe and the hair on the belt was material to the jury's verdict.  The state habeas court found that it was not.

31

At Petitioner's first trial, Petitioner put on an alibi defense.[5] However, at Petitioner's second trial, he abandoned that theory and put on no evidence whatsoever. The jury was presented with the eyewitness testimony of Terri Bannister and Carli Campbell, both of whom testified that Petitioner shot Terrence Spencer and then strangled him. The new evidence revealing that the blood on the victim's shoe was that of Ms. Bannister merely confirms that, at some point, Ms. Bannister's blood got on the shoe. If the hair that was found on the belt that was used to strangle the victim was Ms. Campbell's (a fact not proven), that evidence merely confirms that, at some point, one of Ms. Campbell's hairs got on the belt. Neither piece of evidence exculpates Petitioner. Petitioner's challenge to the credibility of Bannister's and Campbell's testimony was a question for the jury, and the jury believed them.

Petitioner has not shown a reasonable likelihood that Lt. Myers' original testimony influenced the jury's guilty verdict, and the state habeas court so found. Furthermore, Petitioner has not demonstrated a constitutional violation based upon Lt. Myers' failure to perform DNA testing on additional evidence. Petitioner has not proven, by clear and convincing evidence, that any of the evidence would have exculpated him.

---

[5] The undersigned is not in possession of the first trial transcript and finds that it is not relevant to the instant proceeding.

Thus, Petitioner has not established that the state habeas courts' decisions were contrary to or an unreasonable application of clearly established federal law, namely that of <u>Brady</u>, <u>Giglio</u> and <u>Napue</u>. Nor has Petitioner demonstrated that the state habeas courts' decisions resulted in an unreasonable determination of the facts in light of the evidence presented in the state proceedings. Therefore, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact and Respondent is entitled to judgment as a matter of law on Petitioner's claims in his section 2254 petition.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 34) and dismiss this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(C), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections,

identifying the portions of this Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Judge Faber.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to transmit a copy to counsel of record.

    November 15, 2010                              

              Date                            Mary E. Stanley

                                       United States Magistrate Judge